LUCIANI (MURATI v.). See Case No. 9,936.

---

## Case No. 8,591.

### The LUCINDA SNOW.

[Abb. Adm. 305; [1] 11 N. Y. Leg. Obs. 97.]

District Court, S. D. New York. July, 1848.

SHIPPING—MASTER—SALE OF WRECKED VESSEL— PERIL TO VESSEL—NECESSITY—PURCHASER.

1. It is well settled in this country, that the master, as such, has authority to sell a wrecked vessel, when he proceeds in good faith, exercising his best discretion for the benefit of all concerned; and this whether the sale is made in view of a peril then involving the vessel, or of one likely to ensue, from which, in the opinion of persons competent to judge, she cannot be rescued.

2. The circumstance that the master who has sold a stranded vessel believed at the time that he could get her off, would be pertinent to show bad faith avoiding the sale; but proof that the purchaser believed himself able to rescue the vessel, can have no such effect.

3. The degree of necessity which justifies the sale of a wrecked vessel by the master,—defined.

4. The purchaser of a wrecked vessel from the master is not bound, in order to maintain his title, to furnish direct and positive evidence of the honesty of the master's conduct and of the necessity of the sale; but presumptive proof of those facts is sufficient.

This was a libel in rem, filed by Alfred Peabody against the schooner Lucinda Snow,

---

[1] [Reported by Abbott Brothers.]

to recover possession of that vessel. W. W. Rogers intervened by claim and answer, setting up a title to the vessel by purchase at auction, under the following circumstances: The schooner was purchased at Boston jointly by the libellant and one Dawson Lincoln, for a joint commercial adventure, the vessel to sail under the command of Lincoln as captain. The two purchasers loaded her with a cargo upon joint account; and in December, 1846, the schooner, thus loaded, was dispatched by Peabody and Dawson, under the command of Dawson, on a voyage to Galveston and a market. She reached Galveston and delivered her cargo, and was there loaded on freight for the Rio Grande; and having accomplished this voyage, she was chartered by the government of the United States for a further voyage,—in the prosecution of which she was cast away on the island of Sacrificios, near Vera Cruz, in the storm known as the great "norther" of May 2, 1846. The gale prevented any aid being rendered to the vessel until May 3d, when a survey was made under the direction of Captain Lincoln. The vessel was condemned to be sold; and on May 8th she was sold at auction by the government auctioneer, and was bought by the claimant for $1,750. The libellant claimed the vessel as sole owner.

A. F. Smith, for libellant.

(1) The onus of proving the validity of the sale rests on the claimant. The Sarah Ann [Case No. 12,342]; Id., 13 Pet. [38 U. S.] 387.

(2) The claimant must make out good faith in the master, and a case of extreme necessity. The master has no authority to sell unless in a case of extreme necessity. 3 Kent, Comm. (5th Ed.) 131. He may sell, provided it be done in good faith, and in a case of supreme necessity, which sweeps all ordinary rules before it. 3 Kent, Comm. 173. At all events, a sale can only be justified by extreme necessity and the most pure good faith. Abbott, Shipp. 26. All the circumstances must be submitted to the jury, and they must find both the necessity and good faith. Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604. It is not sufficient that the sale be one of good faith on the part of the master, and for the benefit of all concerned, unless there be an urgent necessity. The Tilton [Case No. 14,054]. For it is certain that he has no authority to sell unless in a case of extreme necessity, and when he acts with the most perfect good faith. Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 262. It is not sufficient that the master acted in good faith and in the exercise of his best discretion; the claimants must prove there was a moral necessity for the sale, so as to make it an urgent duty upon the master to sell. The Sarah Ann [Case No. 12,342]; Id., 13 Pet. [38 U. S.] 387. If the circumstances were such that an owner of reasonable prudence and discretion, acting upon the pressure of

the occasion, would have directed a sale, from a firm opinion that the vessel could not be delivered from her peril, &c., the sale is said to be valid. The Sarah Ann [Case No. 12,342]; The Fanny and Elmira Hicks, Edw. Adm. 117; The Fortitude [Case No. 4,953]; Robinson v. Commonwealth Ins. Co. [Id. 11,949]; Same v. Royal Exchange Assur. Co., 8 Taunt. 755; 3 Brod. & B. 151; Abb. Shipp. 7–24, and cases cited.

(3) A more stringent rule is applied as between the purchaser from the master and the owner, than between the owner and underwriter. The Tilton [supra].

(4) Upon the question of necessity, it seems that the actual conduct of the master, in connection with the other circumstances, is to be taken into consideration. In other words, fraud, upon the part of the master, is evidence of a want of necessity. Robinson v. Commonwealth Ins. Co. [supra].

(5) The fact that the vessel was got off is certainly a strong circumstance against the necessity for the sale. The Sarah Ann [Case No. 12,342]; Abb. Shipp. 22, note. It is, however, by no means conclusive. We must weigh all the circumstances. 1. The position and exposure of the vessel. 2. The season of the year. 3. The danger from storms. 4. The expense. 5. The probable chances of success in getting her off. 6. The necessity for immediate action.

(6) Necessity is not to be inferred from the fact that the sale is in good faith. Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604, 620, 621.

(7) A survey is not conclusive as to the state of the vessel, though, if regularly and honestly made, it is very strong evidence. Fontaine v. Phenix Ins. Co., 11 Johns. 293; Anth. 16, note a. If the surveyors acted fairly, and the master acted fairly, his acts in conformity with their opinions will be justified, unless it shall be made to appear that the facts on which they founded their opinion were untrue, or their inferences incorrect, and the burden lies on those who impeach the survey. The Sarah Ann [supra]. The report is presumed to be made in good faith, and fairly, unless the contrary appears. Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 264; The Fortitude [supra].

(8) Admiralty surveys are inadmissible to prove the facts they recite. Abbott v. Sebor, 3 Johns. Cas. 46; Saltus v. Commercial Ins. Co , 10 Johns. 487. The facts must be proved like other facts. Cort v. Delaware Ins. Co. [Case No. 3,257]; U. S. v. Mitchell [Id. 15,-791]; Hall v. Franklin Ins. Co., 9 Pick. 466. The survey is not evidence of the facts, but only that a survey was made. Watson v. Insurance Co. of North America [Case No. 17,284].

E. C. Benedict, for respondent.

(1) This is a possessory action. Now it is clearly impossible to say what interest libellant may have in the vessel till the accounts are taken between him and Lincoln, who were partners in the joint adventure of the vessel, her cargo, and freight. That account cannot be taken in admiralty, and this possessory action must fail for that reason.

(2) Lincoln and the libellant, being partners in the vessel and cargo, and Lincoln being in charge of the property as master and managing owner, he was competent to give a good title for the whole vessel, (she being wrecked,) on being actually paid for her her full value, as he was by the claimant. 3 Kent, Comm. (3d Ed.) 154. And the co-owner cannot sustain a possessory libel without proving, affirmatively, such collusion or fraud or knowledge on the part of Rogers, as would destroy his character as a bona fide purchaser.

(3) Captain Lincoln was, at the time of the sale, owner of one half of the schooner—the papers of the vessel were in his name, and he was actually half owner. The transaction between him and the libellant was a mere mortgage, neither transferring the title nor the possession, and was not registered nor entered on the register. Lincoln was quite competent, then, to sell and convey one half of the vessel, and receive the purchase-money; and the claimant, Captain Rogers, therefore, in any view of the case, has a good title to one half the vessel, and the other owner having no greater share, cannot sustain a possessory libel for the whole.

(4) Under the foregoing circumstances, the sale to Captain Rogers was more than a sale of a stranded vessel by a mere master. It was a sale by a master having an unusual interest and control, and clothed with an unusual discretion as master, and being also an equal owner and partner, and authorized to advise and direct the master. A purchaser, under such circumstances, will not be held to such stringent rules as are applied to a sale by a mere master.

(5) But if this were a case of a sale by a mere master, the title of Captain Rogers would be good.

(6) The powers of a master of a vessel flow from the nature and necessities of his employment. He must have, in most matters, the rights of ultimate and absolute sovereignty. He unites the legislative, judicial, and executive functions in the police and management of his ship's company, and he has the right of eminent domain, so to speak, in all the property under his charge, cargo as well as ship, and whenever required by the perils to which he must be continually exposed, and which in detail can never be foreseen, he may subject it to taxation, (average contribution,) —he may destroy it, (jettison or cutting away,) —he may encumber it, (bottomry,)—he may also use it, (food and clothing,)—he may sell it to make repairs, &c.,—and he may abandon it;—and the power to sell the shattered relics of his vessel when stranded, that he may

bring home the proceeds to his owner, is as reasonable and necessary as any other of his powers. He has all these powers, subject only to the limitation that in his honest judgment, aided by that of those about him, actual injury and imminent peril makes it expedient, for the common good of those interested, that he should exercise the power. Lawrence v. New Bedford Ins. Co. [Case No. 8,140]; Hunter v. Parker, 7 Mees. & W. 342; Smith, Merc. Law, 173.

(7) The necessity which the law requires as the justification of the sale of a stranded vessel by the master, is only such necessity as makes it an urgent duty upon the master to sell for the preservation of the interest of all concerned. The necessity is to be determined in each case by the actual and impending peril to which the vessel is exposed, from which it is probable, in the opinion of persons competent to judge, that the vessel cannot be saved. Lawrence v. New Bedford Ins. Co. [supra]; [The Sarah Ann] 13 Pet. [38 U. S.] 401.

(8) This "necessity," "the actual and impending peril," must of course be "determined" on the spot, and at the time where and when they exist; because there only can they be seen, and there only can the sale take place, and there must the rights of the purchaser be fixed, or the sale would be nugatory or a fraud; and it must be determined by the master, the appointed agent and trustee of all parties, because he alone is there to determine it. To give strength and respectability to his determination, and to preclude injurious imputations, the law counsels him to protest publicly, before a proper public officer, to have a public survey by sworn surveyors, and suitable public notice and a public sale, but it does not require him or them to judge infallibly. The necessity of a sale cannot be denied when the peril, in the opinions of those capable of forming a judgment, makes a loss probable, though the vessel may in a short time be got off. The fact of her being got off raises no presumption of the master's incompetency, or that of his advisers. Nor does her strength or condition, or costs of repairs, as subsequently ascertained, raise a presumption against the necessity, because they are all subsequent to "the actual and impending perils." It is, therefore, not the real and inevitable peril and an absolute necessity which make the sale valid, but the apparent peril and necessity; the probable loss.

(9) The very existence of the necessity, or the duty or expediency of a sale, presupposes that there are other persons whose means and resources or wants are such that in their hands the actual and impending peril is not so formidable as in those of the master, and that they can make it profitable to buy, otherwise there could be no sale.

(10) The "actual and impending peril" is made up of many elements. The incompetency, want of means (no matter how produced) of the master,—the locality,—the proportion of vessels lost or saved on the same beach,—the general opinion of the hopelessness of a loss, —the absence of mechanics, and of tools and materials,—the liability to sudden and unwarned perils rendering it necessary for all other vessels to keep their own means under their own control,—the existence of a state of war,—and the lawlessness and absence of regular government,—all enter more or less into the peril.

(11) Nor can the necessity or propriety of a sale be at all affected by the mode in which the stranding was produced. If the absence of the captain or crew,—the loaning of her chains and anchors,—the neglect of the captain,—caused the vessel to go ashore, or deprived him of the means of getting her off, it would not affect the purchaser. It is the "actual and impending peril," no matter how produced, which justifies the sale.

BETTS, District Judge. The schooner Lucinda Snow was stranded on the island of Sacrificios, near Vera Cruz, about May 1, 1847, in a violent norther. She was driven up into the sand of the beach two or three hundred feet, and several hundred yards beyond a depth of water sufficient to float her. About twenty vessels were wrecked in that vicinity in the same gale.

The master, who was also half owner, called a survey. The particulars of the survey are not proved by any party who made it. Several witnesses, however, testify to the extreme peril of the vessel, and to the small probability that, in her condition, and with any means which could be procured at that place, that she could be saved.

The master decided to sell her. She was sold at public auction, and bought by the claimant for $1,750. He succeeded in getting her off at an expense of about $250, and she was found not injured so as to prevent her making the voyage to New Orleans; and, after some repairs there received, she was brought to this port. She was here arrested by the libellant, who asserts that the claimant acquired no legal title by the sale and purchase.

The law applicable to this subject is no longer open to doubt in this country. The cases of The Tilton [Case No. 14,054]; Robinson v. Commonwealth Ins. Co. [Id. 11,949]; The Henry [Id. 6,372], decided in this court in 1834; and The Sarah Ann, 13 Pet. [38 U. S.] 387; Id. [Case No. 12,342]—clearly establish the authority of the master, as such, to sell a wrecked vessel, when he proceeds in good faith, exercising his best discretion for the benefit of all concerned, and in view either of existing peril, or of perils likely to ensue, from which, in the opinion of persons competent to judge, she cannot be rescued.

I do not now recapitulate the testimony, but it is strong and satisfactory to show that no reasonable hope could be entertained that

the vessel, in her then situation, could be saved by use of any means belonging to her, or which her master could procure at that place; for although there were numerous vessels of all sizes at anchor in the roadstead, at the time, yet the hazard to ships at that anchorage from the formation of the coast, and the suddenness and violence of northers, demands the constant command, for their own protection, of all the anchors and tackle they are usually supplied with.

Anchors, cables, and floats were the essentials requisite for the relief of vessels wrecked and buried in the sand there, and witnesses of long experience at that port testify that little or no chance exists for procuring them on hire in aid of a wreck. It is ordinarily, therefore, only by sale of wrecks to those making it a business or speculation to recover them, that any thing can be reasonably hoped to be saved for the owners, when vessels become disabled and unnavigable in that region of country.

In the cases cited, the courts consider and dispose of the suggestion that the master is bound to exert himself to save his vessel, when she is not so desperately circumstanced but that bystanders are prepared to purchase her, and are able to get her off; and although it is reurged here, nothing can be added to the force of argument by which it is repudiated by the circuit and supreme courts. The Sarah Ann [Case No. 12,342]; Id. 13 Pet. [38 U. S.] 401.

The answer of the claimant is relied upon as distinguishing this case in an important feature from those cited, as it admits that he would not have bid for her unless. in his opinion, there was a reasonable prospect of getting her off. But it is to be observed that this is the answer of the purchaser, and not of the master; proof that the master believed he could rescue his vessel with the means he had at command would be pertinent to show the sale was without good faith, and to prevent any title passing under it. But no such effect can be given to the motives and judgment of the buyer. Of course, he acts under the persuasion that he may be able to save the wreck.

Neither is it of any effect upon the validity of the sale that the loss of the schooner occurred through the culpable negligence of the master, in leaving her to encounter the gale without a sufficient crew on board, and for objects of private adventure and profit. The buyer is not bound to inquire further than to ascertain the danger of her position on shore. and the propriety of her sale, and he can be no way made chargeable for antecedent misconduct, or want of skill or prudence in the master.

Mal-conduct and bad faith in the master in the sale is charged upon the evidence of the first mate, that the master had purchased a wrecked vessel. which was anchored near the schooner, on board of which he had an anchor of his own of sufficient weight to have enabled him, with the force at his command, to haul the Lucinda Snow out of the sand in which she was imbedded. It is insisted he was bound to use the anchor for that purpose.

It may well be doubted, upon the whole proof, whether that single anchor would have been an adequate support to the force necessary to draw the schooner off the bank the distance she had been driven on shore; but the conclusive answer to the argument is. that the master was not bound to deprive his own vessel, which was held by that anchor, of her security, in order to attempt the relief of the schooner. Had it been proved he had in possession or control an anchor of that kind, not employed with or necessary to another vessel, it might be proper to consider upon the evidence whether it was a neglect of duty on his part to omit the use of that means to save the schooner, so palpable as to be notice to the purchaser that the sale was without authority; or whether the chances of success, with such light assistance, would not be so remote as to justify his resorting to a sale, notwithstanding the possession of such aid.

The earlier English authorities no doubt demanded the existence of a case of extreme necessity, an imperative, an overwhelming necessity to justify the master in selling. Abb. Shipp. 9, 12. Chancellor Kent evidently favors that doctrine. and seems inclined to exact the highest degree of necessity to uphold a sale made upon the sole authority of the master. 3 Kent, Comm. 173. These epithets are exceedingly indefinite and uninstructive: for, notwithstanding their intensity, it was never asserted that the situation of the vessel should be desperate to authorize a sale by the master. This would be to hold that she could only be sold either as fragments or after the loss was absolutely total.

The supreme court of the United States, in the case already cited, removes the ambiguity of the epithets "extreme," "supreme," &c., and gives precision to the rule, by placing this requisite of necessity as an element in the power of sale, on a footing both reasonable and practical.

To render a sale valid, in a case of stranding, to pure good faith in the master is to be united the necessity, "to be determined in each case by the actual and impending peril to which the vessel is exposed, from which it is probable, in the opinion of persons competent to judge, that she cannot be saved." The master must collect the best information his situation and the urgency of the case may admit, in respect to the actual condition and injury of his vessel,—the character of her exposure in that situation,—and the known and probable means he may command for her relief; and then, if his honest opinion concurs with that of competent judges, whom he may have opportunity to

consult, his power to sell is not only complete, but the necessity then becomes an urgent duty upon him to sell for the preservation of the interest of all concerned. The Sarah Ann, 13 Pet. [38 U. S.] 400.

Chancellor Kent concedes this to be the now settled doctrine on this subject. 3 Kent, Comm. (6th Ed.) 174, note; Smith, Merc. Law, 171, note. Judge Story states the rule in perhaps broader phraseology,—The Fortitude [Case No. 4,953],—but the principle is compressed and made definite in the decision of the full bench,—[The Sarah Ann] 13 Pet. [38 U. S.] 400; Lawrence v. New Bedford Ins. Co. [Case No. 8,140].

It is argued that the large sum bid for the vessel proves, that in the judgment of those attending the sale, she was not in imminent peril. There is, no doubt, force in the suggestion, but it is merely a speculative one— no witness testifying to a belief she was worth so much—and it is to be weighed in connection with other considerations notoriously acting at such sales. The spirit of competition and even bravado, are apt to mingle with and influence a course of public biddings, and whilst courts may, perhaps, properly indulge in the speculation that bystanders, awake to their own interest, will not permit vessels or property to be so acquired at wholly inadequate prices,—The Sarah Ann [Case No. 12,342],—even such conclusions would very slightly uphold the presumption that at a brisk auction the biddings might not largely exceed the fair value of the articles on sale.

In the present case it would certainly be more satisfactory to have evidence of efforts made by the master to obtain assistance, and the testimony of persons applied to or who knew his exertions in that behalf, than to be left to decide the case upon the opinions and judgments of witnesses, all of whom except two, (and those two standing in a good degree in direct conflict in their statements,) without personal knowledge of the acts or efforts of the master, or, as matter of fact, of the actual difficulties and impediments to his getting off the vessel, or obtaining the necessary aid to do it.

It is to be remarked, that Thompson the mate, whose evidence is relied upon as impeaching the conduct of the master, stands in material contradiction with himself in his sworn protest and the deposition given in this cause, and that the master died at Vera Cruz soon after the sale, so that the now claimant cannot have the advantage of his instructions to supply proofs of his motives and conduct; and I am not disposed to introduce into this case a rule more rigorous than any heretofore indicated by the courts, and to hold that a purchaser, to maintain a title under a master's sale, must furnish direct and positive evidence of the honesty of the master's conduct and the necessity of the sale. The implied and presumptive proof to that point, in my judgment, in this case, is sufficient and satisfactory. I shall accordingly hold that the claimant has made out a sufficient and valid title to the vessel, and that the libel must be dismissed.